UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-60190-cr-HURLEY/HOPKINS

UNITED STATES OF AMERICA

       Plaintiff,

vs.

RAMON BATISTA,

       Defendant.
_____/

## POSITION OF THE UNITED STATES ON SENTENCING

The United States hereby submits its position on the sentencing of the defendant, Ramon Batista, in accordance with Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the U.S. Sentencing Guidelines, and the policy of this Court. The United States respectfully opposes the defendant's request for a downward variance and requests that the Court sentence the defendant as recommended in the Pre-Sentence Investigation Report ("PSIR") and this memorandum.

On January 5, 2017, as part of a plea agreement, the defendant pleaded guilty to Counts One, Three, and Nine of the Indictment. Count One charged him the defendant with conspiracy to commit wire fraud; access device fraud; the use, production or possession of modified telecommunications instruments; and the use or possession of hardware or software configured to obtain telecommunications services, in violation of Title 18, United States Code, Section 371; Count Three charged him with wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2; and Count Nine charged him with aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

As the defendant admitted in his plea agreement, he was a member of a sophisticated fraud ring with numerous members operating in South Florida and elsewhere in the country and overseas. Conspirators obtained access to thousands of cell phone accounts around the United States and fraudulently used those accounts to transmit tens of thousands of international calls to Cuba, Jamaica, the Dominican Republic, and other countries with high calling rates. They employed phishing techniques and social engineering to steal sensitive personal information and then used that information to take over the cell phone accounts of individuals around the country or used the identities they stole to open fraudulent new accounts. The conspirators and others then trafficked in cell phone customers' telecommunication identifying information—which they referred to as "lines"—using that data as well as other software and hardware to reprogram or "clone" cell phones they controlled to enable them to make international phone calls that would later be billed to the customers' accounts. Subsequently, they used the reprogrammed cell phones and additional telecommunications equipment to run illegal call termination businesses— contracting with calling card companies, Voice over Internet Protocol ("VoIP") providers, and other telecommunications companies to route international calls for payment, and then transmitted those calls through the reprogrammed phones without paying for access to the phone companies' networks. In doing so, they pushed millions of dollars of costs from themselves to thousands of cell phone customers around the country and those customers' cell phone providers, who typically absorbed the costs for the fraudulent international calls.

Specifically, the defendant performed multiple roles in the conspiracy. First, he acted as a "call site" operator, maintaining and re-programming cellular telephones in his own residence through which he could route calls.

Second, the defendant also supplied "lines" to other co-conspirators, and received money for doing so. For instance, the defendant admitted that he sent or received from other co-conspirators approximately 1,132 "lines." He also admitted that the illegal use of those lines the lines associated with the same account holders resulted in at least $794,418 in losses to Sprint and Verizon.

Third, the defendant sold telecommunications services through Arymyx, Inc. ("Arymyx"), an Orlando-based company that he owned and operated. For example, he would enter into contracts with other telecommunications providers—such as VoIP carriers or calling card companies—to route international calls for those companies through the fraud scheme. These providers would pay the defendant for transmitting calls to countries such as Cuba and the Dominican Republic, and he would remit some of this money to co-conspirators as compensation for providing "lines" and operating call sites through which the defendant would direct the fraudulent traffic. For example, in one nine-month period from May 2011 through February 2012, the defendant admitted that he received over $221,902 from other telecommunications providers for transmitting their traffic through "cloned" phones in call sites.

The defendant has stated that he has a background in computers and telecommunications. For example, in the late 1980s and early 1990s, the defendant worked at CODETEL (now Claro), the largest telecommunications company in the Dominican Republic. He later worked in the Dominican Republic for a couple of call services companies, a gaming company, and a bank. According to the PSIR, the defendant was granted residency in the U.S. in 2003, lived in New York and New Jersey, returned to the Dominican Republic in 2004, and then came back to the U.S. in 2008. PSIR at ¶ 133. He has lived in Orlando since around January 2009. *Id.*

During the conspiracy, the defendant was well-aware that he was committing crimes. In fact, in emails and conversations with other co-conspirators, he asked them not to mention his real name and expressed concern about being investigated and discovered by law enforcement. For example, in an email to co-defendant Edwin Fana with co-defendant Farintong Calderon's email address, the defendant warned Fana not to use the defendant's real name in dealing with Calderon and to refer to the defendant by the pseudonym "Porfirio." The defendant also instructed Fana to "never say my name, or rather, erase it from your dictionary." Moreover, in another email, the defendant listed "rules" for running a call site. Among these "rules," the defendant instructs the recipient to pick a different name and use that name to create an email address, instant messenger account, and Skype profile, including a false picture obtained from Google. In fact, during the conspiracy, the defendant often used the aliases Porfirio Rubirosa and Julian Riveras Gomez, and employed the email addresses porfirio-rubirosa@hotmail.com, and julianriverasgomez@hotmail.com in the scheme. Also, in the "rules" email, the defendant told the recipient to "keep this a secret," "[y]ou don't know me at all," and to avoid drawing attention or "raising suspicion." And during the conspiracy, the defendant had a conversation with Fana in which, among other things, he expressed concern about people in the conspiracy cooperating with law enforcement and mentioned an individual who had gone to jail for similar crimes.

In the PSIR, the probation officer assigned to this case determined that the defendant has a total offense level of 24, a criminal history category of I, a Guidelines range of 51 to 63 months of prison, and that he is also subject to an additional two-year consecutive sentence for Count Nine. The United States agrees.

The United States files this opposition to the defendant's request for a "downward variance" from the Guidelines. Pursuant to the plea agreement, the PSIR, and the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully recommends that the Court sentence consistent with the PSIR and this memorandum, namely, to a sentence of 75 months in prison.

DISCUSSION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has also directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.* Ultimately, the sentence imposed must be "sufficient, but not greater than necessary to comply with the purposes set forth in" § 3553(a).

The 11th Circuit has stated, "We ordinarily expect a sentence within the Guidelines range to be reasonable...." *United States v. Gonzalez,* 550 F.3d 1319, 1324 (11th Cir. 2008). In requesting a below-Guidelines sentence, the defendant bears the burden of showing that his Guidelines sentence would be unreasonable in light of the record and the panoply of § 3553(a) factors, which the court is bound to consider in determining an appropriate sentence. *Id.* The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court. *United States v. Williams*, 456 F.3d 1353, 1363 (11th Cir. 2006). However, a sentence based on an improper factor fails to achieve the purposes of § 3553(a) and may be unreasonable. *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007). Moreover, "[d]epartures should only occur in unusual cases where there is something atypical about the defendant or the circumstances

surrounding the commission of the crime." *United States v. Miller*, 146 F.3d 1281, 1284 (11th Cir. 1998).

I.   The Appropriate Guidelines Range

The probation officer assigned to the case has completed a PSIR stating that under the Guidelines the defendant's total offense level is 24 and further concludes that the defendant's criminal history category is I.  As a result, the defendant faces a Guidelines range of 51 to 63 months plus an additional two-year consecutive sentence for Count Nine.  The United States and the defendant agree that these calculations are correct.

According to the PSIR, (1) the defendant's offense level should be determined using Section 2B1.1(a)(1) of Guidelines and the defendant's base offense level is 7; (2) the greater of actual or intended loss is more than $550,000 and no greater than $1,500,000, thus resulting in a 14-level increase pursuant to Section 2B1.1(b)(1)(H); (3) the offense involved 10 or more victims, thus resulting in a 2-level increase pursuant to Section 2B1.1(b)(2)(A)(i); (4) the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, thus resulting in a 2-level increase pursuant to Section 2B1.1(b)(10)(C); and (5) the offense involved the possession or use of device-making equipment or authentication features or the production or trafficking of unauthorized access devices or counterfeit access devices or authentication features, thus resulting in a 2-level increase pursuant to Sections 2B1.1(b)(11)(A) and (B).  PSIR ¶¶ 103-113.

The United States and the defendant further agree that the defendant has clearly demonstrated acceptance of responsibility for his offenses and has assisted the government in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty.  Accordingly, the defendant qualifies for a 2-level decrease in

offense level under Section 3E1.1(a) of the Guidelines and the United States will move pursuant to Section 3E1.1(b) prior to or at the time of sentencing for an additional 1-level decrease in the defendant's offense level. As a result, the defendant has a total offense level of 24.

II.     The 18 U.S.C. § 3553(a) Factors

18 U.S.C. § 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

In the defendant's sentencing memo, he requests a downward variance arguing that the Court should sentence him to a below-Guideline sentence based on numerous factors. However, the probation officer assigned to the case did not identify any factor warranting a variance or departure from the guidelines range under the U.S. Sentencing Guidelines. The United States agrees.

First, the defendant argues that the Court should grant him a sentencing variance because he provides financial and caretaking support to his family; works at multiple jobs; committed his crimes to support his family financially; has cooperated with the government; will be deported after serving his sentence; has a low risk of recidivism; has a bachelor's degree in computer science; is in Criminal History Category I; does not abuse narcotics and does not need vocational training; and plans to pay restitution to the victims. However, these factors are either irrelevant under the Guidelines or already taken into account in the calculation of the Guidelines range.

Second, the defendant suggests that a Guideline sentence would create an "unwarranted disparit[y]" with his already sentenced co-defendants Edwin Fana and Jose Santana, and requests that he only be sentenced to 24 months in prison. However, imposing such a low sentence on the defendant given his conduct in the fraud scheme would in fact be unfair to Fana and Santana and *create* an unwarranted sentencing disparity.

The defendant is just as culpable as Fana—if not even more culpable—and thus he faces the same guidelines range under the U.S. Sentencing Guidelines than Fana did. However, while the defendant did provide extensive and laudable cooperation to the government after his arrest, that cooperation has not yet risen to the level of substantial assistance or, for that matter, come close to matching Fana's assistance. As a result, after the United States filed a sealed motion in connection with Fana's sentencing, Fana received a significant reduction in his sentence for substantial cooperation and the Court sentenced him to 48 months in prison. Accordingly, in the view of the United States, Fana's sentence does not justify any variance from the Guidelines for *the defendant*. In addition, the Court sentenced Santana to 52 months in prison. Here, the defendant was more much active and involved in the conspiracy than Santana, engaging in the conspiracy for a longer time and filling multiple roles. So, in comparison to Santana, the defendant does warrant a significantly higher sentence—as appropriately reflected in the defendant's Guidelines range.

CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny the defendant's request for a downward variance and sentence the defendant according to the PSIR and this memorandum to 75 months of prison.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By: /s/ Jared M. Strauss
JARED M. STRAUSS
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5501264
500 E. Broward Blvd., Suite 700
Ft. Lauderdale, Florida 33394
(954) 356-7255 (telephone)
(954) 356-7336 (fax)
jared.strauss@usdoj.gov

MATTHEW A. LAMBERTI
Court ID No. A5502226
Senior Counsel
United States Department of Justice
1301 New York Avenue, NW
Washington, DC 20530
(202) 514-1026
matthew.lamberti@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of March, 2017, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ Jared M. Strauss
JARED M. STRAUSS
Assistant United States Attorney
